IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Condemnation of Fee Simple Title : 
to 0.069 Acres of Vacant Land and : 
Certain Easements Owned by : 
Brandywine Village Associates : 
(UPI#30-5-226) and Condemnation : 
of Fee Simple Title to 1.93 Acres : 
and a Temporary Grading Easement : 
Over 0.26 Acres of Vacant Land : 
Owned by L&R Partnership and : 
John R. Cropper (UPI#30-2-47) for a : 
Public Sheet : 
                                     : No. 1409 C.D. 2017
Appeal of Brandywine Village : Argued: June 7, 2018
Associates, L&R Partnership, and : 
John R. Cropper : 


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI                     FILED: July 2, 2018


        Brandywine Village Associates (BVA), L&R Partnership (L&R) and John R. Cropper (Cropper) (collectively, BVA) appeal the order of the Court of Common Pleas of Chester County (trial court) overruling their preliminary objections in response to East Brandywine Township's (Township) declaration of taking to condemn the southeastern edge of a 10.46-acre parcel (L&R Property) for

the construction of a road (Connector Road) connecting the parcel with Horseshoe Pike (Route 322), on which it fronts, and North Guthriesville Road.

# I.

## A.

The properties at issue in this dispute consist of three parcels located in the Township. Carlino East Brandywine, L.P. (Carlino) is the equitable owner of a largely undeveloped tract of land that is approximately 10.118 acres (Carlino Property). The Carlino Property was originally part of a 21-acre parcel. BVA owns the remaining acreage, adjacent to the east side of the Carlino Property, which has been developed as a shopping center (BVA Development). To the north side of the Carlino Property is the L&R Property, an undeveloped parcel of land owned by L&R and Cropper. L&R is the general partner of BVA, and Cropper is a 50 percent owner in the L&R Property and the BVA Development.

Prior to Carlino's acquisition of the Carlino Property, BVA had certain rights to use it under a Cross Easement Agreement entered into with Carlino's predecessor in title. Because the original 21-acre parcel did not have access to any public sewer, the Cross Easement Agreement provided that BVA would build a sewer plant at its expense on the Carlino Property for the use of both properties. The Cross Easement Agreement also granted BVA an easement to the Carlino Property for stormwater management as well as an access easement to use the Carlino Property as a main entrance to BVA's shopping center.[1]

---

[1] Under the Cross Easement Agreement, the predecessor-in-interest granted BVA a sewer system easement to install an on-site septic sewer system, including a drainage area and reserve **(Footnote continued on next page…)**

**B.**

Beginning in 2010, Carlino submitted land development plans to the Township to build a 51,525 square-foot supermarket with a 9,250 square-foot expansion area, a 4,600 square-foot attached retail building, and a pad site for a 4,088 square-foot bank. From the beginning, the Township insisted that Carlino provide and pay for the construction of the Connector Road.[2]

Because the Connector Road was to cross over the L&R Property, in August 2014, the Township and Carlino entered into a Memorandum of Understanding (MOU), which provides in pertinent part:

> In order to support existing volumes of traffic and traffic projected to be generated by new growth and development in the Township, the Township has an interest in creating [the Connector Road.]

---

**(continued…)**

drainage area. It also provided an access easement to allow construction of a roadway through the property to the BVA property. The Cross Easement Agreement specified that the access drive could be modified, but that it must not "interfere with the flow of traffic . . . or with surface water drainage." (Reproduced Record (R.R.) at 2541a.) The Cross Easement Agreement further provided a highway improvement easement, dedicating land within the ultimate right-of-way along Route 322 to public use, and a stormwater basin and drainage easement, which included a reserve effluent disposal area.

[2] A fuller description of the facts and procedural history of the underlying land development dispute can be found in *Brandywine Village Associates v. East Brandywine Township Board of Supervisors* (Pa. Cmwlth., No. 164 C.D. 2017, filed January 5, 2018) ("*Brandywine I*") and *Brandywine Village Associates v. East Brandywine Township Board of Supervisors* (Pa. Cmwlth., No. 1149 C.D. 2017, filed April 19, 2018) ("*Brandywine II*").

The Connector Road would traverse the eastern side of the Carlino Property and extend northward through [the L&R Property]. . . .

In order to construct the Connector Road, a portion of the Carlino Property would need to be used for the right-of-way and the construction of the Connector Road and related improvements.

In addition, in order to construct the Connector Road and [stormwater] management facilities necessary for the Connector Road, a portion of the L&R Property (the "Connector Road Parcel") and right-of-way over a small area of the [BVA] Property adjacent to Horseshoe Pike ("322 ROW") would need to be acquired. . . .

Further, the [access and stormwater basin and drainage easements granted under the Cross Easement Agreement (collectively, Easements)] are located in areas on the Carlino Property where the Connector Road is proposed and will need to be modified or extinguished in order to construct the Connector Road.

The Connector Road is intended as a public road for use by the general public and is not necessary for the development of [Carlino's] Property. The Township has made an independent judgment that the Connector Road is in the public interest and for a public purpose.

The Township has informed [Carlino] that the Township would like the Connector Road constructed by [Carlino] in connection with development of the Project.

\* \* \*

[However, as] a result of [Carlino's] inability to acquire the Connector Road Parcel and the 322 ROW and extinguish the Easements by negotiation, the Township intends to exercise its power of eminent domain to acquire the Connector Road Parcel and the 322 ROW and terminate the Easements as necessary to construct the Connector Road.

4

(Reproduced Record (R.R.) at 1340a-1350a.) Under the MOU, Carlino, in lieu of paying a significant portion of the Township's transportation impact fee of $1,795,000, was obligated to design, permit and construct at its expense the Connector Road and dedicate it to the Township.

On October 2, 2014, the Township's Board of Supervisors adopted Resolution 15 of 2014 authorizing the condemnation of the above property and easement interests for the construction of the Connector Road and associated improvements. The Township then filed a declaration of taking on November 17, 2014, for the condemnation and acquisition of: (1) fee simple title to a strip of land on the southern boundary of the BVA Property for use as a deceleration lane; (2) BVA's access driveway and stormwater easements over the Carlino Property granted under the Cross Easement Agreement; and (3) fee simple title to vacant land located at the southeast corner of the L&R Property, through which it plans to install the Connector Road. The condemned portion of the L&R Property contains a significant amount of wetlands and a pond.

BVA timely filed preliminary objections, which were later reduced because the trial court sustained the Township's and Carlino's responsive preliminary objections.[3] As modified, BVA's preliminary objections are as follows:

---

[3] Following BVA's preliminary objections, the Township and Carlino filed responsive preliminary objections. In circumstances outside of eminent domain proceedings, these objections would have been asserted under Pa.R.C.P. No. 1028(a)(1) (lack of subject matter jurisdiction); Pa.R.C.P. No. 1028(a)(2) (failure of a pleading to conform to law or rule of court or inclusion of scandalous or impertinent matter); Pa.R.C.P. No. 1028(a)(3) (insufficient specificity in a pleading); and Pa.R.C.P. No. 1028(a)(4) (demurrer). On April 16, 2015, the trial court filed **(Footnote continued on next page…)**

5

(1)    The land taken is in excess of that which is reasonably required to serve the public purpose. (Preliminary Objections filed on January 7, 2015 at ¶ 4.A.)

(2)    The declaration of taking contains an insufficient recital of the purpose of the condemnation.  (*Id.* at ¶ 4.A.2.)

(3)    The purpose of the Township in filing the declaration of taking is not to install the Connector Road. The recital of purpose in taking the 1.93 acres fails to note it is for a detention basin, the condemnation of which by a second class township is not authorized by law. (*Id.* at ¶ 4.A.3.)

(4)    The condemnation violates Section 204(a) of the Private Property Protection Act, 28 Pa.C.S. § 204(a), which prohibits the taking of private property in order to use it for private enterprise.  (*Id.* at ¶ 4.A.5.)

(5)    The takings were never properly authorized by the Resolution adopted by the Board of Supervisors of East Brandywine Township on October 2, 2014.  (*Id.* at ¶ 7.)

---

**(continued…)**

an order sustaining these responsive preliminary objections.  On appeal, BVA seems to contend that this was in error because the Rules of Civil Procedure are not applicable to eminent domain proceedings.  *Gilyard v. Redevelopment Authority of Philadelphia*, 780 A.2d 793, 794 (Pa. Cmwlth. 2001).  However, BVA does not identify what responsive preliminary objections it disputes or how exactly it was prejudiced by the trial court's purported error.  In any event, just because the Rules of Civil Procedure are not applicable does not mean that they cannot be used in an "instructive" manner.  As we have explained, in eminent domain cases, preliminary objections serve a somewhat broader purpose and are intended as a procedure to resolve expeditiously the threshold factual and legal challenges to a declaration of taking, without awaiting further proceedings. *In re Condemnation of .036 Acres, More or Less, of Land Owned by Wexford Plaza Associate*s, 674 A.2d 1204, 1207 (Pa. Cmwlth. 1996).  Here, that is exactly what the Township's use of preliminary objections aimed to do.

(6) All the proposed takings are principally intended to benefit a private entity, to wit, Carlino East Brandywine, LP. (*Id.* at ¶ 11.)

(7) The declaration of taking is defective because it fails to include all condemnees necessary to acquire fee simple title as set forth in the declaration. Specifically, the individual owners of BVA, their tenants, subtenants, employees, concessionaires, licensees, customers, and invitees. (Preliminary Objections filed on January 7, 2015 at ¶ 13.)

(8) The documents attached to the declaration of taking do not demonstrate a concrete plan for the use of the specific property taken for a public road. (*Id.* at ¶ 19.)

(9) The declaration of taking impermissibly seeks to widen or improve a state highway, which is barred by Section 2304 of the Second Class Township Code,[4] 53 P.S. § 67304, absent the consent of [the Pennsylvania Department of Transportation (PennDOT)]. (*Id.* at ¶ 20.)

(10) The declaration of taking condemns property greater than 120-feet in width, the maximum size of a right-of-way for any township of the second class. (*Id.* at ¶ 21.)

(11) An earlier Township resolution, on August 20, 2014, authorized the Township's MOU with Carlino, which required the condemnation now at issue, and the [d]eclaration of [t]aking's failure to attach that resolution makes it defective and untimely. (*Id.* at ¶ 30.)

(12) Townships of the second class are barred from enacting resolutions, and the resolution that authorized the declaration of taking is therefore illegal. (*Id.* at ¶ 31.)

---

[4] Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. §§ 65101 – 68701.

7

(13)   There is no public benefit to the Connector Road. (Preliminary Objections filed on January 7, 2015 at ¶ 35.)

(14)   The takings violate Section 3 of The Administrative Code of 1929,[5] 71 P.S. § 512, Section 911 of the State Highway Law,[6] 36 P.S. § 670-911, and 87 Pa. Code § 441.8(j)(5).  (Order filed on September 16, 2016, R.R. at 136a.)

(15)   The takings are a violation of Section 508(4)(iv) of the Municipalities Planning Code,[7] 53 P.S. § 10508(4)(iv).  (*Id.*)

In essence, BVA's preliminary objections can be divided into three types:  (1) an assertion that the condemnation is not for a public purpose and/or excessive; (2) an assertion that the condemnation is procedurally flawed; and (3) an assertion that the Connector Road is illegal and/or is administratively barred from construction.

## II.

## A.

Before the trial court, BVA primarily relied on the testimony of Norman Ulrich (Ulrich), a licensed professional engineer, to challenge the scope and advisability of the taking.  Regarding the purpose of the Connector Road, Ulrich testified that he believed the new turning radii of the Connector Road were

---

[5] Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §§ 511 – 527.

[6] Act of June 1, 1945, P.L. 1242, *as amended*, 36 P.S. §§ 670-901 – 670-911.

[7] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101 – 11202.

8

dangerous.  However, because he performed no analysis of the existing turn radii, Ulrich was unable to testify as to whether the new plan was safer, less safe, or the same as the existing conditions.

As to the purported excessiveness of the scope of the taking, Ulrich disputed what the size of the taking for a stormwater drainage basin on the L&R Property should be.  Ulrich opined that only 20 percent of the access easement and 26 percent of the stormwater basin easement would be used for the Connector Road.  If the drainage basin located on the L&R Property was designed to only collect stormwater runoff from the Connector Road, its size would be reduced up to 76 percent.  However, Ulrich did not know what the appropriate depth was for his proposed basin or whether the depth should be increased or decreased.  One of his suggestions also required only dedicating the rearmost portion of the Connector Road to the Township, and he was "not sure how that works."  (R.R. at 338a.)

Ulrich disagreed with the methodology used by ARNA, the company that prepared Carlino's plans.  That company utilized both the Best Management Practices (BMP) manual and the TR-55 to determine that Carlino would be able to manage its stormwater runoff in the manner required by the relevant Township ordinance.  The BMP manual is a set of guidelines for stormwater best management practices promulgated by the Pennsylvania Department of Environmental Protection (DEP), which, at the time of Ulrich's testimony, was issued in 2006.  The TR-55 is a book that outlines a design analysis process used as a guideline in evaluating stormwater management plans, but does not address rain

9

gardens. Ulrich's analysis was conducted using the TR-55 only, even though he was aware that the Carlino site design included rain gardens.

**B.**

In opposition to Ulrich's testimony, the Township and Carlino offered the testimony of engineers Andreas Heinrich (Heinrich), Mark Padula (Padula), and Charles Dobson (Dobson).

Heinrich is a traffic engineer and transportation planner working as the consulting traffic engineer for the Township. He had urged that the Connector Road run entirely parallel to the Carlino/BVA boundary to align it with a then-proposed road on the other side of Route 322. Heinrich also explained that it was important to shift the Connector Road east in order to maximize the distance between signals along Route 322.

He also testified that PennDOT has no written rule regarding the distance between signals, but the "general rule of thumb is to try to achieve a minimum of a thousand foot spacing centerline to centerline between successive signals." (R.R. at 931a.) He believed that the distance between the existing access easement's egress onto Route 322 and the signal at Bollinger Road, located to the west of the access easement, was approximately 900 feet. However, regardless of the exact distance, he would prefer to place the Connector Road's egress onto Route 322 as far to the east as possible, in order to maximize the distance between signals. Heinrich also testified that it was a best engineering practice to align roads with property boundaries.

10

Padula, a civil engineer for 23 years, testified as a fact and expert witness with engineering expertise in stormwater management. Padula was hired as a consultant by the Township and participated in the development and review of the Carlino land development application, with a particular emphasis on the Connector Road's stormwater management facilities. Padula testified that ARNA's stormwater calculations are based on BMPs that incorporate the rain gardens to be installed on the Carlino site, which will slow the rate at which stormwater drains from the Carlino development. Padula testified that the Township's stormwater obligation with respect to the Connector Road is to ensure that the post-developed runoff rates and volumes be controlled to the level of the pre-developed rates and volumes. In doing so, the Township must manage direct rainfall and runoff from the Carlino Property as it is presently configured.

He opined that bio-retention basins should be designed to maximize surface area for two reasons: first, shallower basins are preferred for safety reasons; second, best practices require a drainage basin with a surface area "that is no less than eight times smaller than the drainage area getting to it or five times smaller than the impervious area draining to it." (R.R. at 1115a.) Padula opined that, even if no water from any source other than the Connector Road was to drain to the contemplated detention basin on the L&R Property, he would not have reduced the surface area of that basin. Padula also noted that the Township had an obligation to install the pipe that will laterally cross the L&R Property to handle pre-existing stormwater from the L&R Property, which will no longer have access to its existing drain because of the construction of the Connector Road. The pipe the Township will install is no larger than necessary to meet the Township's

obligations, and that even if no water from any source other than the Connector Road was to drain to the contemplated detention basin, including any drainage from Carlino's development, he would not have reduced the surface area of the basin on that site.

Dobson is a civil engineer and licensed professional engineer whose company was retained by the Township as its municipal engineer for the Carlino Development. In addition to being a fact witness, Dobson was qualified as an engineering expert. Dobson worked with Padula on reviewing Carlino's application and agreed with Padula that the stormwater detention basin proposed for the L&R Property is adequately sized to handle runoff from the Connector Road, and that he would not change the surface area of the detention basin even if the total runoff to the basin was reduced. Dobson agreed with Padula that the Township is obligated to install the drainpipe laterally on the L&R Property, and that its size and location would not change based on the volume of water it will carry.

He opined that the alignment of the Connector Road as depicted on the Carlino Plan is generally consistent with good engineering practice. Dobson opined that running the Connector Road through the Carlino development, as opposed to along its eastern edge, would be inconsistent with good engineering practice. Dobson testified that the Township could not run the Connector Road along the eastern edge of the Carlino development and allow the remaining portion of the access easement to stay because it would create inherent vehicular conflicts. Even if the pavement of the access easement was removed and replaced with grass,

12

Dobson was concerned that the holder of the easement could attempt to exercise the easement in the future, which would create the same inherent vehicular conflicts. Dobson does not believe that the Connector Road will be dangerous for trucks entering the BVA Development.

## C.

As for the purpose and/or legitimacy of the taking, the Township first offered the testimony of Scott Piersol (Piersol), who has been the Township manager and emergency management coordinator for 21 years. Piersol testified about the purpose of the taking, explaining that Carlino has the option to build the Connector Road for the Township in exchange for a reduction in its traffic impact fee; if it chooses not to do so, the Township will assess the full impact fee and the Township itself will construct the Connector Road. He explained that the Township has an incentive to reach agreements with developers to construct township roads like the Connector Road because it is less expensive for the developer to build a road than the Township, given Pennsylvania's prevailing wage laws. He also explained the reason the Township wishes to construct the Connector Road is because it will create a much safer road situation at the intersection of North Guthriesville Road and Route 322 because, currently, an eastbound movement or left turn coming out requires the motorist to turn across three lanes of traffic. Piersol has witnessed accidents and near accidents at the intersection of Route 322 and North Guthriesville Road several times per year.

Piersol further testified that he participated in drafting the MOU and recounted that Heinrich, the Township's traffic engineer, advised that an earlier

13

plan for the Connector Road should be amended by adding a second access to the BVA Development to address queueing issues. He also suggested to the Township that BVA could further alleviate queueing by altering its own parking lot setup. The existing Carlino Plan at the time of the hearing addressed both of these issues.

Piersol also testified that there were a series of unadvertised meetings between Township officials and Carlino employees and officers to discuss the Carlino Development, including the effect the development might have on the BVA Development. During several of those meetings, two to three members of the Board of Supervisors attended as well as Piersol to voice support for the Carlino Development. At one of those meetings, two of the Township Supervisors indicated a willingness to condemn certain portions of the BVA Development and the L&R Property because the Township was interested in the Connector Road. Although there was mention by Carlino that it was considering a development that did not include the construction of the Connector Road, this option was ultimately not pursued.

Piersol testified that after discussing potential development strategies with Carlino, the Township began to insist that Carlino agree to indemnify it against litigation related to the development. Once the Carlino development was ready for formal action by the Board of Supervisors, the Board initially did not give notice of its intention to vote on the Carlino issues to BVA. This is consistent with the Township's policy, which is that it is the interested parties' "burden to be aware of the submission through the legal notice." (R.R. at 514a-515a.) In spite of that policy, the Board ultimately gave special notice to BVA's counsel of its

14

intention to vote on the MOU. On March 15, 2012, Piersol wrote a letter in which he described the road as being "definitely a public purpose" and describing the BVA/Carlino sewer dispute, which is not a subject of the condemnation, as "a bit less of a public purpose." (R.R. at 516a.)[8]

Mark Kocsi (Kocsi), the Township's Chief of Police since 2002, also affirmed the need for a Connector Road. Kocsi testified that he is familiar with the Township's roadways and traffic control devices. He testified that accidents regularly occur at the intersection of Route 322 and North Guthriesville Road, the most recent occurring several weeks prior to his testimony. The Department of Transportation (PennDOT) has designated the section of Route 322 at the intersection of North Guthriesville Road as an "aggressive driving area" and provides grant funds for additional policing. (R.R. at 605a.) While Kocsi did not participate in the formal design process for the Connector Road, he voiced concerns about a lack of speed control devices in an early draft of the Connector Road. Addressing these concerns, the current development plan for the Connector Road includes crosswalks and stop signs. Kocsi opined that the proposed Connector Road would have a "huge effect" on the traffic flow of the area, ameliorating the danger of the intersection. (R.R. at 606a.)

---

[8] Stacey Fuller has been the Township Solicitor since 2004. Her testimony echoes Piersol's testimony that, while Carlino was free to pursue a development plan without the Connector Road, doing so would have increased the effective cost of its traffic impact fee by approximately $2 million. She also echoed Piersol's testimony that had the Township collected the $2 million traffic impact fee, it would have used those funds to construct the Connector Road on its own, first using its eminent domain power to condemn the entire length of the necessary construction.

Arnold Kring (Kring) has been a Township Supervisor since January 2012 and is one of the supervisors who signed the MOU. Kring testified that in determining the details of the property to be condemned and the size of the condemnation, he relied on Township personnel, including the Township's engineers. Kring also testified that the condemnation in general and the Connector Road in particular were intended by the Township for a public purpose – namely, its use as a public road by the general public. Kring further testified that the Township exercised its independent judgment in determining that construction of the Connector Road was in the public interest.

Peter Miller (Miller) is the president of Carlino and testified that the Township required the egress onto Route 322 be moved to the eastern edge of the Carlino development. Miller testified that in August 2013, Carlino developed a plan without the Connector Road, which the Township suggested it could proceed with, but was never pursued because it would likely result in further delays due to litigation with BVA. Miller testified that the Township was "adamant" about the construction of the Connector Road (R.R. at 767a), and if Carlino proceeded with a plan that did not include the Connector Road, it would incur a traffic impact fee of between $1.5 to $1.9 million. By constructing the Connector Road, Carlino will receive a credit against that impact fee of not all but "some residual amount." (R.R. at 778a.)[9]

---

[9] Other testimony was offered before the trial court but is not relevant to this appeal. Francis Hanney, the traffic services manager for PennDOT, testified about his review of Carlino's development and compliance with certain regulations. Marc Jonas, a land use and real estate attorney, testified about the Cross Easement Agreement. Leonard and Richard Blair, who represented BVA, testified about their attempts to negotiate with Carlino.

Following seven days of hearings, the trial court overruled BVA's preliminary objections in their entirety, determining that BVA did not sustain its heavy burden for challenging the declaration of taking. This appeal followed.[10]

## III.

On appeal, BVA once again contends that the declaration of taking lacks a public purpose and is excessive, procedurally flawed, and/or is otherwise unauthorized, illegal, or barred.[11] We first address BVA's various contentions that the Township's taking was for a private purpose and/or excessive.

---

[10] When a trial court has either sustained or overruled preliminary objections to a declaration of taking, our scope of review is limited to determining whether the trial court abused its discretion or committed an error of law. *In re Condemnation by Beaver Falls Municipal Authority*, 960 A.2d 933, 940 (Pa. Cmwlth. 2008).

[11] For the first time on appeal, BVA contends that the declaration of taking was deficient in failing to sufficiently and accurately describe the subject properties. BVA also contends that the Township was not authorized to:

> (1) take the access easement because it is a public road under the Donated and Dedicated Property Act, Act of December 15, 1959, P.L. 1772, *as amended*, 53 P.S. §§ 3381–3386;
>
> (2) modify the access easement because it is a public road that can only be modified by a court of common pleas, pursuant to Section 18 of the General Road Law, Act of June 13, 1836, P.L. 551, 36 P.S. § 1981;
>
> (3) take the sewage easement for a private purpose, pursuant to Section 2501 of the Pennsylvania Second Class Township Code, 53 P.S. § 67501; and
>
> (4) take the drainage easement for a private purpose, pursuant to Section 2702 of the Second Class Township Code, 53 P.S. §67702.

**(Footnote continued on next page…)**

**A.**

Townships of the second class, like the Township here, possess the authority to condemn private property for appropriate public uses under The Second Class Township Code. Pennsylvania's Eminent Domain Code[12] provides the "complete and exclusive procedure and law to govern all condemnations of property. . . ." 26 Pa.C.S. § 102(a). Section 306(a)(3) of the Eminent Domain Code provides, in relevant part:

> (3) Preliminary objections shall be limited to and shall be the exclusive method of challenging:
>
> (i) The power or right of the condemnor to appropriate the condemned property unless it has been previously adjudicated.
>
> (ii) The sufficiency of the security.
>
> (iii) The declaration of taking.
>
> (iv) Any other procedure followed by the condemnor.

26 Pa.C.S. § 306(a)(3). "Land may be taken only to the extent reasonably required by the public purpose for which the power is exercised, else it will be overturned

---

**(continued…)**

Because these issues were not raised in BVA's preliminary objections before the trial court, they are waived. *See* 26 Pa.C.S. § 306(b) ("**Waiver.--**Failure to raise by preliminary objections the issues listed in subsection (a) shall constitute a waiver. Issues of compensation may not be raised by preliminary objections.").

[12] 26 Pa.C.S. §§ 101–1106.

18

as excessive." *Reading Area Water Authority v. Schuylkill River Greenway Association*, 100 A.3d 572, 578 (Pa. 2014) (citation omitted).

Pennsylvania's Property Rights Protection Act (PRPA) prohibits condemnations of private property for private use, except under certain specified circumstances. It provides:

> **(a)** **Prohibition.--**Except as set forth in subsection (b), the exercise by any condemnor of the power of eminent domain to take private property in order to use it for private enterprise is prohibited.
>
> **(b)** **Exception.--**Subsection (a) does not apply if any of the following apply:
>
> * * *
>
> (2) The property is taken by, to the extent the party has the power of eminent domain, transferred or leased to any of the following:
>
> * * *
>
> (iii) A private enterprise that occupies an incidental area within a public project, such as retail space, office space, restaurant and food service facility or similar incidental area.
>
> (3) There is, on or associated with the property taken, a threat to public health or safety.
>
> * * *
>
> (9) The property is used or to be used for any road, street, highway, trafficway or for property to be acquired to provide access to a public thoroughfare for a property which would be otherwise be inaccessible as the result of

19

the use of eminent domain or for ingress, egress or parking of motor vehicles.

26 Pa.C.S. § 204. Our Supreme Court has held that the PRPA is more restrictive in scope than preexisting constitutional protections against the state's power of eminent domain. *Reading Area Water Authority*, 100 A.3d at 583.

As the trial court found, the PRPA does not apply here because the condemnation falls within the exceptions set forth above. First, the condemnation is needed to construct a "road, street, highway, [or] trafficway[.]" 26 Pa.C.S. § 204(b)(9). To whatever extent some portion of the condemned land not used for the Connector Road will, after the condemnation, be occupied by Carlino, that occupation is nothing more than "an incidental area within a public project, such as retail space, office space, restaurant and food service facility or similar incidental area." *Id.* at § 204(b)(2)(iii). Again, this is within another exception to the PRPA. Finally, the land taken by the Township that is not to be used exclusively as a paved road is being taken in order to manage its stormwater obligations and to avoid the threat to public safety that will be caused by the location of the existing access easement once the Connector Road is built – a third exception to the PRPA. *Id.* at § 204(b)(3).

Even though the PRPA does not apply, we must still examine whether the taking violates the constitutional provision that outlaws takings that are not primarily for a public purpose. "Under the Constitution, land may only be taken without the owner's consent if it is taken for a public use. The question of what constitutes a public use is highly fact-dependent." *Reading Area Water Authority*,

20

100 A.3d at 580. It is beyond well settled that a "taking does not []lose its public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest also may be benefited." *In re Legislation Route 62214, Section 1-A*, 229 A.2d 1, 3 (Pa. 1967) (quotation omitted). Roads, in particular, "almost always benefit the owners of the land through which they are laid out, and are often constructed at the request of individuals [] but it has never been held that the laying out of a highway [] is invalid on that account." *Id.*

Condemnees bear the burden of proof in sustaining preliminary objections. *In re Condemnation of Real Estate by Borough of Ashland*, 851 A.2d 992, 996-97 (Pa. Cmwlth. 2004). The same can be said for establishing fraud, collusion, arbitrariness, bad faith or an abuse of power or discretion. *In re School District of Pittsburgh*, 244 A.2d 42 (Pa. 1968). This burden is a "heavy" one and must overcome the strong presumption that the condemnor has acted properly. *Appeal of Waite*, 641 A.2d 25 (Pa. Cmwlth. 1994).

**B.**

While admitting that part of the taking is for the Connector Road, BVA points out that the majority of the L&R Property being condemned will be used for stormwater facilities, some of which may be used by Carlino to manage stormwater from its development. Furthermore, a fraction of the access easement will be renounced by the Township altogether, and the present Carlino Plan calls for development on that area, including approximately one-third of a proposed

21

bank site and eight parking spaces. Simply put, BVA is challenging the purpose and scope of the taking.

In one fashion or another, all of the above assertions rely on Ulrich's expert testimony opining that the Connector Road is not necessary and that taking of the stormwater basin and access easements are excessive. However, multiple fact and expert witnesses disagreed with Ulrich on those very issues. Various witnesses testified that the intersection of Route 322 and North Guthriesville Road is dangerous under existing conditions due to the configuration of the roadway and the physical features of the land at the intersection. Padula and Dobson also disagreed with Ulrich as to the necessary size of the detention basin located on the L&R Property, both testifying that the Connector Road construction dictated its size.

Accordingly, what we have here is competing testimony from Ulrich and all other expert and fact witnesses, and unfortunately for BVA, the trial court found that Ulrich's "testimony made clear that his opinions were based on assumptions and guesswork" and assigned his testimony "minimal weight." (Trial Court Opinion at 26, 41.) We will not disturb the trial court's credibility determinations or reweigh the evidence on appeal.[13]

---

[13] For similar reasons, we reject BVA's contention on appeal that the trial court capriciously disregarded Ulrich's testimony.

In any event, the trial court found that the taking served a public purpose, was not excessive, and fell within exceptions of the PRPA, and that any benefit received by Carlino was incidental at best. As the trial court cogently explained:

During seven days of hearings, multiple witnesses confirmed that the intended purpose and the actual outcome of the condemnation will be for the construction of a road connecting North Guthriesville Road and [Route 322] and support facilities necessary for that road. The [d]eclaration of [t]aking states that the condemnation is for this purpose. Multiple witnesses testified that the Connector Road is important to the Township because it will alleviate traffic at the existing intersection of [Route 322] and North Guthriesville Road, which has been the site of multiple accidents. Chief Kocsi provided evidence of multiple accidents at the intersection, some serious enough to result in hospitalization. The Township anticipates that the intersection will become more dangerous over time due to increased development. Witnesses for both sides testified that drivers are already using the BVA Development as a cut-through to avoid the intersection, demonstrating a public interest in routing traffic away from the intersection. The Connector Road is a road that will be open to the public, which is a sufficient public purpose to justify condemnation.

* * *

[T]he evidence suggests that the Township cannot allow the existing access easement to remain once it routes the Connector Road to [Route 322] as planned. All witnesses, including [BVA's] witnesses, agree that PennDOT regulations do not permit two egresses onto Route 322 in such close proximity. Neither can the Township allow the existing access easement to continue as an unpaved access easement, since doing so allows the holder of the easement to exercise its right of access in

23

the future, which would be contrary to PennDOT policy and would create a dangerous traffic pattern.

Carlino's original design called for the Connector Road to follow the access easement and exit onto [Route 322] at the present signalization. Under this plan, Carlino's bank pad and parking were entirely outside the BVA's easements, and could be built by right[,] and without Township assistance. [Heinrich], Township traffic engineer and transportation planner, insisted that the location of the bank pad site and Connector Road be reversed. [He] testified that doing so was necessary to maximize the distance between signals along [Route 322], to avoid an unsafe traffic pattern within the bank parking lot, and to align the Connector Road with the property boundary, which is a traffic engineering best practice. The result of the relocation is that although a fraction of Carlino's proposed bank and some parking will be located on land that is presently a BVA access easement, Carlino receives no net benefit. But for the Township's request that the Connector Road be moved, Carlino would have the right to erect precisely the same bank, as was proposed and approved for [in an earlier development plan made by a previous developer].

With respect to the L&R P[roperty], there is no evidence that the Township's taking of the L&R [Property] was affected by Carlino's hope that it would be able to use that site for stormwater management. Both Mr. Padula and Mr. Dobson testified that, regardless of Carlino's use of the Township's stormwater facilities, both the drain pipe and the stormwater detention basin would remain the same size and in the same location.

The evidence wholly supports the conclusion that the condemnation is intended for the construction of the Connector Road. The PRPA does not apply to the project because the condemnation is intended to be used to construct a "road, street, highway, [or] trafficway [ . . . . 26 Pa.C.S. § 204(b)(9).] To the extent some land will be occupied by Carlino, that occupation is nothing more than "an incidental area within a public project, such as retail space, office space, restaurant and food

24

service facility or similar incidental area"[,] which is also an exception to the PRPA. [26 Pa.C.S. § 204(b)(2)(iii).] Finally, the land the Township is taking that is not to be used exclusively as a paved road is being taken to manage its stormwater obligations and to avoid the threat to public safety that will be caused by the location of the existing access easement once the Connector Road is built, which is a third exception to the PRPA. [26 Pa.C.S. § 204(b)(3).]

(Trial Court Opinion at 24, 27-28.)

For the reasons stated above, BVA failed to meet its heavy burden of demonstrating that the taking is for a private purpose, excessive, and/or in bad faith.[14]

---

[14] BVA also contends that the Township condemned its property in bad faith because it primarily serves Carlino's private interests. To this end, BVA contends that the trial court erred by capriciously disregarding Ulrich's testimony that the taking was unnecessary and/or excessive as well as the fact that meetings were held between Carlino and some members of the Board of Supervisors. Again, the trial court did not ignore Ulrich's testimony but gave it "minimal weight" because his "testimony made clear that his opinions were based on assumptions and guesswork." (Trial Court Opinion at 26, 41.) What BVA also ignores is that the proposal for the Connector Road predates Carlino's development. In 2005 or 2006, the Township entertained a plan from a former developer that proposed constructing a development similar to that of the Carlino Plans, which included a Connector Road. In addition, Carlino's original design called for the Connector Road to exit onto Route 322 at the present signalization. Under this plan, Carlino's bank and parking lot were entirely outside the Brandywine Village easements and could be built by right, without Township assistance. It was only at the Township's insistence that the Connector Road be constructed at the present location. As to the meetings between Carlino and the Township that BVA contends establish collusion and bad faith, BVA has only established that there were meetings between Carlino and the Township to coordinate the construction of a public road, which is obviously not evidence of bad faith.

## C.

BVA next contends that the Township lacked legal authority and/or jurisdiction to file the declaration of taking. BVA first contends that the Township's taking is not permitted under Section 2306 of the Second Class Township Code, 53 P.S. § 67306, which provides, "The width of the right-of-way of a public road in townships shall not be less than thirty-three feet or more than one hundred and twenty feet . . . ." To this, we repeat the trial court's words, "This claim is disingenuous at best. In fact, as the plans entered into evidence make clear, the Township is not building a 214.76 foot wide road but, instead, is constructing a fifty-foot-wide right-of-way. The balance of the condemned property represents the remainder of BVA's access easement." (Trial Court Opinion at 38.)

BVA also challenges the Township's ability to take ten feet in width of BVA's property along Route 322 for the creation of a new deceleration lane for the proposed Connector Road. According to BVA, the Township's taking is in direct violation of Section 3 of The Administrative Code of 1929, 71 P.S. § 512, Section 911 of the State Highway Law, 36 P.S. § 670-911, and 87 Pa. Code § 441.8(j)(5). As the trial court already explained, these provisions are irrelevant to the Township's power to condemn.

Section 3(a)(10) of the Administrative Code provides that PennDOT shall "have exclusive authority and jurisdiction over all State designated highways[.]" 71 P.S. § 512(a)(10). Section 911 of the State Highway Law only relates to widening state highways and not to the Township's power to condemn.

26

36 P.S. § 670-911.[15]  PennDOT's regulation provides, "[i]f an auxiliary lane must be located in front of property of another person, the applicant shall be required to secure the approval of the other person or indemnify the Commonwealth against any action which the other person may bring against the Commonwealth."  67 Pa. Code § 441.8(j)(6).

Clearly, what BVA is attempting to do is challenge the Township's compliance with certain statutes and regulations.  This is not within the scope of Section 306 of the Eminent Domain Code, but rather is collateral to the

---

[15] Section 911 of the State Highway Law provides:

> Whenever a State highway is constructed and the State pays a portion of the cost, and the county, or township, or borough, pays a portion of the cost, or the State pays the entire cost, and it is deemed advisable to widen the State highway beyond the width as laid out and ordered by the secretary or other body having authority over the same, the county and township, or borough, jointly, or the township or borough, may increase the width of the State highway, including the width of right of way, with consent of the secretary or other body having charge of the construction of said State highway.  An increase in the width of right of way may be by the adoption of the official plan of the Department of Highways by the township or borough.  The cost of such additional width shall be borne jointly by the county and township, or borough, or wholly by the said township or borough, as the case may be.  Authority is hereby given the several counties through their commissioners and the several townships and boroughs through their proper officers, to enter into agreement providing for the additional width of the State highway, in accordance herewith.  Such additional width shall be constructed under the supervision of the department, and according to its plans and specifications.

36 P.S. § 670-911.

condemnation proceedings. *Appeal of Gaster*, 556 A.2d 473, 478 (Pa. Cmwlth. 1989). Again, Section 306 of the Eminent Domain Code provides that "the condemnee may file preliminary objections to the **declaration of taking**. . . ." 26 Pa.C.S. § 306(a) (emphasis added). These preliminary objections are limited to challenges to: (i) **the power** of the condemnor **to take** the condemned property; "(ii) [t]he sufficiency of the security[;] (iii) [t]he **declaration of taking**[; and] (iv) [a]ny other procedure followed by the condemnor." 26 Pa.C.S. § 306(a)(3)(i)-(iv) (emphasis added). Objections that do not fall within those described above are not proper subjects for preliminary objections to a taking, but are collateral in nature and will not be considered. *In re Condemnation of Property Situate in Perry Township*, 938 A.2d 517, 521 (Pa. Cmwlth. 2007).

Accordingly, for the foregoing reasons, we affirm the trial court's order overruling BVA's preliminary objections.

_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Condemnation of Fee Simple Title : 
to 0.069 Acres of Vacant Land and : 
Certain Easements Owned by : 
Brandywine Village Associates : 
(UPI#30-5-226) and Condemnation : 
of Fee Simple Title to 1.93 Acres : 
and a Temporary Grading Easement : 
Over 0.26 Acres of Vacant Land : 
Owned by L&R Partnership and : 
John R. Cropper (UPI#30-2-47) for a : 
Public Sheet : 
     : No. 1409 C.D. 2017
Appeal of Brandywine Village : 
Associates, L&R Partnership and : 
John R. Cropper : 

# **O R D E R**

AND NOW, this 2nd day of July, 2018, it is hereby ordered that the order of the Court of Common Pleas of Chester County in the above-captioned matter is affirmed.

_____
DAN PELLEGRINI, Senior Judge